IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

BRUNSWICK DIVISION

| | | |
|---|---|---|
| JEFFERY DALE GRANTHAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV 217-151 |
| | ) | |
| CSX TRANSPORTATION, INC., | ) | |
| a corporation, | ) | |
| | ) | |
| Defendant. | ) | |

_____

**O R D E R**
_____

For the reasons stated below, the Court **DENIES** Defendant's Motion to Limit Testimony of Mark Spivey, M.D. and Harrison C. Carter, M.D., (doc. no. 18), and **GRANTS IN PART** Defendant's Motion to Limit Testimony of David Joe Lydick, (doc. no. 19).

**I.     STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY**

Admissibility of expert testimony is governed by Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and its progeny. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Expert testimony is admissible under Federal Rule of Evidence 702 if "(1) the expert is qualified to testify regarding the subject of the testimony; (2) the expert's methodology is 'sufficiently reliable as determined by the sort of inquiry mandated in Daubert'; and (3) the expert's testimony will assist the trier of fact in understanding the evidence or determining a fact at issue." Chapman v. Procter & Gamble Distrib., LLC, 766 F.3d 1296, 1304 (11th Cir. 2014) (citing United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (*en banc*)).

"While scientific training or education may provide possible means to qualify [as an expert], experience in a field may offer another path to expert status. In fact, the plain language of Rule 702 makes this clear . . . ." Fraizer, 387 F.3d at 1260-61. Expert testimony is helpful to the trier of fact when it "'concerns matters that are beyond the understanding of the lay person.'" United States v. Watkins, 880 F.3d 1221, 1227 (11th Cir. 2018) (quoting Frazier, 387 F.3d at 1260). However, "[p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Frazier, 387 F.3d at 1262-63. Moreover, "'expert . . . testimony concerning the truthfulness of credibility of a witness is generally inadmissible because it invades the jury's province to make credibility determinations.'" Jetport, Inc. v. Landmark Aviation Miami, LLC, No. 1:16-cv-23303-UU, 2017 WL 7734095, at *9 (S.D. Fla. July 19, 2017) (quoting United States v. Beasley, 72 F.3d 1518, 1528 (11th Cir. 1996)).

## II. DRS. SPIVEY AND CARTER

Plaintiff seeks damages under the Federal Employer's Liability Act, 45 U.S.C. § 51 *et seq.*, against his employer CSX Transportation, Inc. ("CSX") for an injury allegedly sustained on January 18, 2015, while working as a carman at the CSX Rice Yard in Waycross, Georgia. Plaintiff claims he stepped on a used brake shoe and injured his left knee while attempting to connect air hoses between railcars. Dr. Carter, Plaintiff's primary physician, initially treated Plaintiff for the knee injury before referring him to Dr. Spivey, an orthopedic surgeon, for surgery to repair a meniscal tear. Both physicians opined during depositions that Plaintiff's alleged accident on January 18, 2015, caused the meniscal tear. Defendant moves to exclude both opinions, arguing (1) Dr. Carter deferred to Dr. Spivey; and (2) Dr. Spivey initially determined the tear was degenerative and changed his opinion without an adequate foundation, based on nothing more than learning the surgery related to Plaintiff's legal claim. (Doc. no. 18.)

Dr. Spivey determined Plaintiff suffered a "big tear" in the left knee meniscus, a "sponge that sits in between the two pieces of bone," and performed outpatient knee arthroscopy on June 6, 2015. (Dr. Spivey Dep., doc. no. 36-2, pp. 9-13.) Without any knowledge of Plaintiff's accident or claims in this litigation, Dr. Spivey described Plaintiff's injury in his operative notes as a large tear that appeared to be degenerative in nature. (Id. at 25.) By the time of his deposition, Dr. Spivey was aware of the fall on January 18, 2015, and resulting legal claim, and, when asked to give his opinion concerning causation, testified as follows:

> You know, I think when you put everything together, even though we put degenerative-appearing tear, I think my understanding when I did this knee scope, but I'm not even sure I understood it was in the work comp legal realm

3

> – I thought I was treating him as kind of a normal patient coming in to get better, so I didn't put anything in there as far as causation like I tend to do with work comp. The – but I think, putting it all together, sounds like he had a significant twisting injury, had a meniscal tear, and he waited long enough that it beat up the end of his condyle some and became – appeared more degenerative by the time we took it out.

(Id. at 21-22.) Minutes later, Dr. Spivey confirmed that all medical opinions he expressed during the deposition he believed to a reasonable degree of medical certainty. (Id. at 24.)

Dr. Spivey explained why a meniscal tear caused by an accident can appear degenerative by the time of surgery as follows:

> The problem with that, it's been six months and a 330-pound guy, so it's been six months since the time of his injury, so an acute tear could look more degenerative in that setting because you're in that degenerative ballpark now. It's been six months; it's not two weeks or six weeks where they look a little more fresh. You can tell the difference in a tear acuity versus a chronic tear that's been there a long time. And all you can say is this has been there more than several months. It could have been there five years or it could have been there, you know, six months.

(Id. at 13.) Dr. Spivey reiterated twice he could not determine the timing of the meniscal tear other than saying, based on the degenerative appearance of the injury, it must have occurred more than three to four months before the surgery. (Id. at 13, 26.)

While Dr. Spivey candidly admitted the limitations of his ability to determine the timing of the meniscal tear, when he "put it all together," it made sense to him that a recent workplace accident involving Plaintiff's knee caused the meniscal tear because a recent knee injury can still appear degenerative in six months given Plaintiff's size. (Id. at 22.) The jury will undoubtedly benefit from Dr. Spivey's testimony as Plaintiff's treating surgeon. The weaknesses identified by Defendant are points best made on cross examination and do not undermine his opinions to a degree that requires exclusion under Daubert and its progeny.

4

Dr. Carter treated Plaintiff's knee injury before the surgery and testified to a reasonable degree of medical certainty of a "direct correlation" between the workplace accident and the meniscal tear. (Dr. Carter Dep., doc. no. 21, p. 17.) When notified on direct examination that Dr. Spivey had already offered an opinion concerning causation, and, without the benefit of any description of Dr. Spivey's opinion, Dr. Carter stated he would defer to Dr. Spivey's opinion. (Id. at 18.) While this would preclude Dr. Carter's testimony in the event of a conflict, both treating physicians are in complete agreement as to causation, and the jury would benefit from this information.

Dr. Carter also answered in the affirmative when asked the following question on cross examination: "As far as you know, . . . the only information that you have concerning the fall being correlated with [Plaintiff's] injury is what the patient told you?" (Id. at 18.) One could read this response as a concession that Dr. Carter has no clue what caused Plaintiff's knee injury and relies solely on his patient's opinion of causation. One could also interpret the response as merely indicating Dr. Carter considered Plaintiff's description of the workplace accident and his resulting symptoms when reaching his own expert opinion regarding causation. Experts routinely rely on such information. The latter appears to be the more reasonable interpretation, and regardless, a jury should resolve the issue at trial where this point is best explored on cross examination.

### III. MR. LYDICK

Defendant also moves the Court to exclude the opinions of Plaintiff's liability expert, David Joe Lydick, regarding the following: (1) conditions that did not cause or contribute to Plaintiff's accident; (2) the lighting conditions at the time of Plaintiff's accident; (3) whether Defendant violated 49 C.F.R. § 213.37; (4) whether vegetation prevented Plaintiff from

being able to see the brake shoe; and (5) whether Plaintiff was responsible for the accident. (Doc. no. 19.)

### A. Mr. Lydick's Qualifications

Mr. Lydick has more than forty-seven years of railroad industry experience. (Doc. no. 23-1, pp. 2-3.) Mr. Lydick served as a track laborer and supervisor for more than a decade, during which time he performed track maintenance and repairs to comply with federal regulations, identified and eliminated footing hazards, inspected tracks for Federal Railroad Act compliance, and administered safety programs and operating rules tests. (Doc. no. 23-2, p. 5; doc. no. 35-1, p. 1.)

From 1984 to 2008, Mr. Lydick worked for the Federal Railroad Administration ("FRA") in various capacities, including track safety inspector, district chief and chief inspector, deputy regional administrator, chief inspector and principal regional inspector, project manager for the Safety Assurance and Compliance Program, and manager for Railroad Safety Oversight. (Doc. no. 23-2, pp. 2-4; doc. no. 35-1, p. 1.) During his employment with FRA, Mr. Lydick conducted investigations related to safety complaints, employee injuries and fatalities, train derailments, accidents, and collisions, and worked with the National Transportation Safety Board ("NTSB") to determine causes of major accidents. (Doc. no. 23-2, pp. 3-4.) He also performed tasks related to enforcement, drafting, and interpretation of federal railroad safety regulations and provided guidance concerning the scope, applicability, intent, and effect of FRA regulations. (Id.)

Since retiring from FRA, Mr. Lydick has worked as a railroad safety consultant, training railroad employees and providing litigation consultation in FELA cases. (Id. at 2; doc. no. 35-1, p. 2.) Mr. Lydick is a FRA Certified Track Inspector and has completed over

6

sixty courses and programs on specialized professional railroad training, including numerous courses on railroad accident investigation. (Doc. no. 35-1, p. 2; doc. no. 23-2, pp. 6-7.) During these courses, Mr. Lydick learned a process of railroad accident investigation, which he used while working for FRA and NTSB and continues to use in his consulting work. (Doc. no. 35-1, p. 2.)

### B. Mr. Lydick's Opinions Concerning Ballast Rock and FRA Notification

Defendant argues Mr. Lydick should not be allowed to testify regarding conditions and purported failures not causing or contributing to Plaintiff's accident, including the size of ballast rock between the rails and CSX not reporting Plaintiff's injury to FRA. (Doc. no. 19-1, pp. 2-5.) Plaintiff does not intend to offer any testimony or opinions from Mr. Lydick as to these conditions. (Doc. no. 35, p. 2.) Accordingly, Defendant's motion as to these issues is **MOOT**.

### C. Mr. Lydick May Not Testify Regarding Degree of Darkness at the Time and Location of the Accident but May Testify Regarding Adequacy of Lighting Equipment

Defendant contends the Court should prohibit Mr. Lydick from opining (1) the area where the accident occurred was poorly lighted; and (2) Defendant failed to maintain adequate lighting equipment for nighttime operations in the area where the accident occurred. For the reasons stated below, Mr. Lydick may testify concerning the latter but not the former. In his expert report, Mr. Lydick stated railroads should provide adequate lighting for night work to prevent injuries and opined "the lighting was poor" in the area where the accident occurred. (Doc. no. 23-1, pp. 18-19.) During his November 2, 2018 deposition, Mr. Lydick testified his opinion the accident site was a "low lit area" is based on his daytime inspection, the position of the lighting equipment and railcars in relation to the accident site,

7

the time the accident occurred, and Plaintiff's testimony. (Doc. no. 23, p. 24.) Mr. Lydick acknowledged he could not opine as to the degree of darkness at the time and location of the accident and would rely on Plaintiff's testimony for that purpose. (Id.) Finally, Mr. Lydick stated in his February 14, 2019 declaration

> My opinion that the lighting was inadequate in the area where the plaintiff was hurt is supported by my interview of the plaintiff, his deposition testimony, and his personal injury report. In addition, Bryan Murray's testimony that it would be dark except for buggy lights and my observations of the position of the light poles during the site inspection support my opinion that the lighting for this area was inadequate. My review of the available evidence revealed no testimony or statements suggesting that the area was well lighted when the plaintiff was hurt. Indeed, my analysis of the available evidence suggests otherwise.

(Doc. no. 35-1, p. 8.)

Mr. Lydick may not testify concerning the degree of darkness or light at the time and location of the accident because Mr. Lydick did not inspect the accident scene at night and his opinion, to the extent he intends to offer it, is nothing more than a recitation of observations made by Plaintiff and Mr. Murray. However, Mr. Lydick may testify Defendant failed to maintain adequate lighting equipment for nighttime operations in the area where the accident occurred because, contrary to Defendant's assertions, this opinion does not rely exclusively on Plaintiff's testimony.

To be sure, a critical fact underpinning Mr. Lydick's opinion of inadequate lighting equipment is the testimony of Plaintiff and Bryan Murray describing the accident area that night as dark and identifying the only light source as lights on a nearby ATV. (Doc. no. 24, pp. 50-51; doc. no. 24-6; doc. no. 35-1, pp. 3-6.) In addition, however, Mr. Lydick personally inspected the railroad yard and determined the only light poles were on the outside of the railyard at a "considerable distance" from the accident site. (Doc. no. 35-1, pp.

8

5-6.) Additionally, Plaintiff testified there were tall railcars on adjacent outer tracks that blocked light from reaching the interior track where the accident occurred. (Doc. no. 24, pp. 83-84.) Mr. Lydick explained, in his professional experience, distant light fixtures are ineffective in illuminating areas several tracks away, particularly when railcars on adjacent tracks block the light. (Doc. no. 35-1, pp. 5-6.)

Defendant argues Mr. Lydick's opinion will not assist the trier of fact because his opinion is not based on industry standards or requirements for lighting conditions. Plaintiff testified the lighting was so poor—"bad, dark there" and "dark as hell"—he could not see the gage well enough to observe any tripping hazards such as the brake shoe. (Doc. no. 24, pp. 82-83.) In this context, Mr. Lydick's citation of the general duty for Defendant to maintain a reasonably safe railyard for its employees is adequate. That he cannot cite a more specific standard regarding an exact degree of light to be maintained within the railyard at night is, at best, fodder for cross examination at trial.

Defendant also argues the issue of whether the lighting caused an unsafe workplace is an ultimate issue reserved for the jury. (Doc. no. 19-1, pp. 5-6; doc. no. 40, pp. 2-3.) Arguably, every opinion of an expert touches on the ultimate issue of liability or damages. That is the purpose of expert testimony. Mr. Lydick's opinion the lighting was inadequate is no more so than any other. The jury must still determine whether Defendant maintained adequate lighting, whether any failure in that regard crossed the liability threshold, and whether the lighting played a causal role in Plaintiff's accident. Furthermore, even if Mr. Lydick's lighting opinion could be characterized as embracing an ultimate issue, Federal Rule of Evidence 704(a) permits an expert witness to "testify as to his opinion on an ultimate issue of fact, so long as the opinion is 'based on the personal observations of the

9

witness.'" United States v. Delatorre, 308 F. App'x 380, 383 (11th Cir. 2009) (quoting Carter v. DecisionOne Corp. Through C.T. Corp. Sys., 122 F.3d 997, 1005 (11th Cir. 1997)). As explained above, Mr. Lydick's opinion is based, at least in part, on his personal observation of the lighting conditions at the railyard and accident scene.

Defendant relies on ConAgra Foods Food Ingredients Co. v. Georgia Farm Servs., No. 1-09-CV-00167 (WLS), 2011 WL 13244127, at *2 (M.D. Ga. Dec. 22, 2011), but it is not analogous or instructive in any meaningful way. Therein, the court excluded legal expert testimony as to the reasonableness and good faith of the parties' actions because (1) the ultimate legal issue was reasonableness and good faith; and (2) the party seeking admission had not presented to the court the circumstances under which the expert could proffer his opinion as to damages or provided the appropriate foundation for the expert's opinions. Id. ConAgra is distinguishable because the foundation for Mr. Lydick's opinion is before the Court, and the Court has determined it is sufficient. Furthermore, the expert's opinion in ConAgra concerned purely legal issues regarding good faith and the reasonableness of the parties' actions. Mr. Lydick's opinion concerns an issue of fact.

Two additional cases cited by Defendant buttress rather than call into question the Court's conclusions. In Nichols v. Continental Airlines, Inc., No. CIV. 01-232-B-S, 2012 WL 1724017, at *3 (D. Me. July 23, 2002), concerning a trip and fall during an airline flight, the court excluded testimony by an expert who merely repeated the personal observations of eyewitnesses that the cabin was too dark. The court stated "[l]ay witnesses who were actually present can describe the degree of darkness and the jury can sort it out based on common experience." Id. This is entirely consistent with the Court's conclusion Mr. Lydick cannot testify concerning the degree of darkness or light at the time and location of the

accident. The expert in Nichols did not further opine the lighting equipment in the cabin was inadequate, as Mr. Lydick does here.

Defendant also cites James v. Soo Line R.R., Civ. NO. 16-2462 (MJD/HB), 2018 WL 279743, at *5-6 (D. Minn. Jan. 3, 2018), wherein the court excluded expert testimony regarding lighting at a railroad yard as unfounded because the experts did not visit the scene of the accident to observe the fixed lighting. In contrast, Mr. Lydick visited the accident scene and developed his opinion as to the adequacy of the lighting equipment based on the location of the light poles, the effect of tall railcars on adjacent tracks, and all other information available concerning lighting conditions on the night of the accident.

Finally, Defendant argues Mr. Lydick's opinion should be excluded because it had not been disclosed prior to his February 14, 2019 declaration attached to Plaintiff's brief in opposition to the current motion *in limine*. (Doc. no. 40, p. 2.) However, Mr. Lydick's March 26, 2018 expert report states he was "asked to form an opinion as to whether [Plaintiff] was provided a reasonably safe place to work regarding the track and walking conditions," and specifically opined CSX "did not provide a safe place for [Plaintiff] to walk." (Doc. no. 23-1, pp. 2, 18.) This report is arguably broad enough to include lighting conditions. Furthermore, defense counsel questioned Mr. Lydick about his opinions as to the lighting conditions during the November 2, 2018 deposition, three months before the filing of Mr. Lydick's declaration. (Doc. no. 23, pp. 24-25.) The disclosure was therefore not untimely, and even if it was, Defendant suffered no prejudice.

### D. Mr. Lydick May Testify Regarding Ryegrass Within the Gage

Mr. Lydick opines the presence of ryegrass within the gage of the rail violated 49 C.F.R. § 213.37, which regulates the presence of vegetation on railroad property on or

11

immediately adjacent to the roadbed. (Doc. no. 23, pp. 11, 28; doc. no. 23-1, p. 6; doc. no. 35-1, p. 8.) Mr. Lydick based his opinion on an interview he conducted with Plaintiff, Plaintiff's deposition testimony, and photographs produced by Plaintiff's counsel. (Doc. no. 23, p. 17; doc. no. 23-1, p. 6.) Defendant argues Mr. Lydick's opinion should be excluded because he cannot reasonably rely on: (1) Plaintiff's statements as to the vegetation conditions at the time of the accident because they are inconsistent with photographs taken by CSX just after the accident; and (2) photographs purporting to be of the area where the accident occurred because Plaintiff cannot provide basic information about them. (Doc. no. 19-1, pp. 6-7; doc. no. 40, pp. 3-6.)

During an interview, Plaintiff informed Mr. Lydick the ryegrass was three to three-and-a-half inches tall inside the track where the accident occurred. (Doc. no. 23-1, p. 4.) Plaintiff testified at his deposition the ryegrass was three to three-and-a-half inches tall on the track, citing his own memory as well as photographs of ryegrass on a track. (Doc. no. 24, p. 37.) Plaintiff testified he did not take the photographs, could not recall who sent them to him, and did not know when the photographs were taken. (Doc. no. 24, pp. 44-47.) Mr. Lydick testified the photographs were consistent with Plaintiff's testimony and evidences a violation of the regulation, but he was not aware when the photographs were taken. (Doc. no. 23, pp. 10-11, 18.) Plaintiff stated be "believed" the picture to be of the same track in the area of the accident because of the appearance of the ryegrass in the photograph. (Id. at 46.) Yet, Plaintiff testified the photographs accurately depicted the height of the ryegrass at the time of his injury.

Although Defendant challenges Plaintiff's description of the height of the ryegrass based on its photos taken after the accident, Mr. Lydick has no obligation to accept

12

Defendant's version and reject the testimony of his client. Thus, Defendant's challenges do not justify exclusion of Mr. Lydick's opinion and are more appropriate for cross examination. As the Northern District of Georgia recently explained:

> [S]o long as the expert relies upon record evidence and identifies the facts on which he relies, "it is for opposing counsel to inquire into the expert's factual basis," and "[i]mportantly, the jury is instructed that it is completely free to accept or reject an expert's testimony, and to evaluate the weight given such testimony in light of the reasons the expert supplies for his opinion."

In re Delta/Airtran Baggage Fee Antitrust Litig., 245 F. Supp. 3d 1343, 1362 (N.D. Ga. 2017) (quoting 0.161 Acres of Land, 837 F.2d 1036, 1040 (11th Cir. 1988)).

### E. Mr. Lydick May Not Offer Testimony As to Whether Vegetation Prevented Plaintiff from Seeing the Brake Shoe

Mr. Lydick opines the ryegrass between the rails of the track interfered with Plaintiff's ability to see the brake shoe. (Doc. no. 23, p. 26.) Defendant argues Mr. Lydick may not simply repeat Plaintiff's testimony as expert opinion and, at most, such testimony would amount to an impermissible determination by an expert as to Plaintiff's credibility. (Doc. no. 19-1, p. 8; doc. no. 40, p. 6.) Mr. Lydick testified his opinion on this issue is based solely on Plaintiff's deposition testimony. (Doc. no. 23, p. 26.) Accordingly, Mr. Lydick's opinion would not assist the trier of fact in understanding the evidence or determining a fact at issue, and, in effect, amounts to a credibility determination, which invades the province of the jury. Chapman, 766 F.3d at 1304; Jetport, Inc., 2017 WL 7734095, at *9. Accordingly, the Court **EXCLUDES** Mr. Lydick's testimony on this issue.

### F. Mr. Lydick May Opine Plaintiff Was Not Responsible for the Accident

Mr. Lydick opines Plaintiff complied with his duty to observe the area before stepping between the rails and, thus, was not responsible for the accident. (Doc. no. 23, pp.

29-30.) Defendant argues Mr. Lydick's opinion should be excluded because it is not reliable and will not assist the trier of fact for the following reasons: (1) Mr. Lydick bases his opinion solely on Plaintiff's testimony; and (2) the mere fact Defendant did not charge Plaintiff with a violation of safety regulations is not probative of whether Plaintiff was responsible for the accident. (Doc. no. 19-1, pp. 8-10; doc. no. 40, pp. 6-7.)

First, Mr. Lydick's opinion is not based solely on Plaintiff's testimony. Mr. Lydick has considerable experience as a railroad safety inspector and accident investigator and has received extensive training in determining the root causes of railroad accidents. (Doc. no. 35-1, pp. 1-2.) Mr. Lydick testified his opinion as to whether Plaintiff bore some or all responsibility for the accident is based on Plaintiff's testimony, the relevant conditions at the time of the accident, and CSX's failure to charge Plaintiff with a rule violation. (Doc. no. 23, pp. 29-30.) Moreover, Mr. Lydick stated he also considered Defendant's interrogatory answers, which state no facts in support of its claim Plaintiff was contributorily negligent, and the deposition testimony of CSX employees Messrs. Bryan Murray and Billy Haynes. (Doc. no. 35-1, p. 8.) Finally, Mr. Lydick stated there is no evidence Plaintiff was responsible for the factors contributing to the accident, such as the location of the lighting, the condition of the vegetation, or the presence of the brake shoe. (Id.) Thus, Mr. Lydick's opinion is clearly based on multiple sources of information, in addition to his considerable professional experience.

Second, Defendant argues the mere fact Defendant did not charge Plaintiff with a violation of safety regulations is not probative of whether Plaintiff was responsible for the accident. In support, Defendant cites Sharp v. Paducah & Louisville Ry., Inc., No. 5:07-CV-93-R, 2008 WL 4191475, at *1-3 (W.D. Ky. Sep. 10, 2008), in which the court determined

14

evidence the railroad defendant chose not to pursue a disciplinary action against the plaintiff pursuant to Railway Labor Act ("RLA") procedure was relevant for the purpose of determining comparative fault in a FELA action. However, the court excluded the evidence because it would require a detailed explanation of the complexities of the RLA process, which would likely confuse and mislead the jury. Id. at *2. Here, Defendant does not argue evidence regarding CSX's failure to charge Plaintiff with a violation of the safety regulations would require the sort of onerous explanation of RLA procedure required in Sharp. (Doc. no. 19-1, pp. 8-9.) Defendant only argues the evidence is irrelevant—a proposition undermined by Sharp. Furthermore, Defendant indicates the issue is whether Plaintiff complied with Defendant's rules, leaving it unclear whether the discussion of the RLA procedure at issue in Sharp applies. (Id.) While Defendant may have had other reasons for not charging Plaintiff with a violation of the regulations, this criticism is not a sufficient basis for excluding Mr. Lydick's entire opinion and is best reserved for cross examination.

## IV.  CONCLUSION

Accordingly, the Court **DENIES** Defendant's Motion to Limit the Testimony of Mark Spivey, M.D. and Harrison C. Carter, M.D., (doc. no. 18), and **GRANTS IN PART** Defendant's Motion to Limit Testimony of David Joe Lydick, (doc. no. 19).

SO ORDERED this 17th day of May, 2019, at Augusta, Georgia.

_____
BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA